(No. 10806.—Judgment affirmed.)

HENRY C. WAHLMAN, Admr., Defendant in Error, *vs.* THE C. BECKER MILLING COMPANY, Plaintiff in Error.

*Opinion filed June 21, 1917—Rehearing denied October 5, 1917.*

1. NEGLIGENCE—*what does not show duty of the injured man to guard machinery.* In an action under the Factory act mere proof that the injured man was superintendent of the factory does not establish that it was his duty to see that the machinery by which he was injured was guarded.

2. SAME—*whether machinery could have been guarded in a certain manner is a question for the jury.* In an action under the Factory act for an injury to an employee while "doping" a belt in a flour mill, whether the machinery could have been guarded in a particular manner described in the evidence, so that the accident would have been prevented altogether or at least rendered less probable, is a question for the jury.

3. SAME—*"doping" a belt to prevent slipping is not making "repairs" within meaning of the Factory act.* Applying belt dope to a belt in a flour mill to prevent the belt from slipping is not making "repairs" within the meaning of the Factory act, which provides that no repairs shall be made to the active mechanism or operative part of a machine when the machine is in motion and that safeguards shall not be removed except for purpose of making repairs.

4. SAME—*Factory act makes no distinction in requiring machinery or dangerous places to be guarded.* The Factory act makes no distinction in its requirements as to guarding machinery or

dangerous places whether the objects to be guarded are machines which operate purely automatically and without any workmen coming in contact with them, or whether they are merely places or substances which are dangerous because of their presence to men who may work around them.

5. WORDS AND PHRASES—*ordinary meaning of the word "repair" when applied to machinery.* The commonly understood meaning of the word "repair" when applied to machinery is to restore the machinery to a good, sound condition after decay, injury, dilapidation or partial destruction.

6. CONSTRUCTION—*statutes are generally construed by applying the ordinary meaning of words used.* In construing statutes the ordinary, usual and commonly accepted definitions of the words employed therein are to be taken as the correct definitions of such words unless the statute gives special definitions to the contrary or evidence is introduced to show that the words have a particular meaning in the particular trade or calling referred to in the statute.

COOKE, J., dissenting.

WRIT OF ERROR to the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Randolph county; the Hon. W. E. HADLEY, Judge, presiding.

LASHLEY, BOLLINGER & HORNER, for plaintiff in error.

A. D. RIESS, and A. E. CRISLER, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Henry C. Wahlman, as administrator of the estate of Victor Hahn, deceased, recovered a judgment against the C. Becker Milling Company, plaintiff in error, in the circuit court of Randolph county, in the sum of $6000 for the death of his intestate. The judgment of the circuit court was affirmed, on appeal, by the Appellate Court for the Fourth District.

The declaration charged that the death of Hahn was occasioned by the negligence of plaintiff in error, a corporation, in its failure to comply with the provisions of section 1 of the Factory act, which provides: "That all

power-driven machinery, including  *  *  *  all drums, cogs, gearing, belting, shafting,  *  *  *  mill-gearing and machinery of every description,  *  *  *  in any factory, mercantile establishment, mill or workshop, shall be so located wherever possible, as not to be dangerous to employees or shall be properly enclosed, fenced or otherwise protected. All dangerous places in or about mercantile establishments, factories, mills or workshops, near to which any employee is obliged to pass, or to be employed shall, where practicable, be properly enclosed, fenced or otherwise guarded. No machine in any factory, mercantile establishment, mill or workshop, shall be used when the same is known to be dangerously defective, and no repairs shall be made to the active mechanism or operative part of any machine when the machine is in motion." (Laws of 1909, p. 202.)

Plaintiff in error was engaged in operating a flour mill in the city of Red Bud, in Randolph county. Hahn was employed by plaintiff in error as head miller at $125 per month, was thirty-eight years of age when killed, and left surviving him a widow and three minor children. The rolls in plaintiff in error's mill were placed in rows extending east and west, with an aisle between the rows about twenty-seven inches wide. The row on the south side contained five rolls and on the north row there were four. The second roll from the east in the south row was known as the Nordyke roll and the next roll west of it was known as the Allis roll. Both of these rolls were enclosed, the boxing surrounding each roll being about five feet high. Two of the pulleys by means of which the Nordyke roll was operated were located on the west side of the boxing surrounding that roll and near the north side or end of the boxing, the upper pulley being about forty inches above the floor and the lower one four or five inches above the floor. These pulleys were connected by a belt about four and one-half inches wide. The Allis roll had a like system of pul-

leys and a belt on the east side and near the north end of
the boxing surrounding that roll. The pulleys and belts on
these two rolls were only a few inches apart, and there was
a board partition between the two lower pulleys, extending
twelve or fourteen inches above the floor. The slipping of
the short belt on the pulleys of the rolls in the mill was of
frequent occurrence. That condition was remedied by the
application of a belt dressing, referred to by the witnesses
as "belt dope," to the inner surface of the belt while it
was in motion, and it was Hahn's duty to apply the belt
dressing when the belt began slipping. Plaintiff in error
obtained and furnished the belt dope in the form of sticks
about six inches in length, and the dope was applied by
holding the stick of belt dope against the inner surface of
the belt while the belt was revolving around the pulleys.
No one saw the accident. At about nine o'clock in the
morning of August 26, 1911, George Eckles, the second
head miller, was engaged in conversation with Hahn, when
the latter observed that the belt on the west side of the
Nordyke roll was slipping. Hahn secured a stick of the
belt dope and started in the direction of the Nordyke roll.
Eckles went up-stairs and did not again see Hahn until
after the accident. Shortly afterwards other employees of
plaintiff in error discovered Hahn on the floor, his body
being in the aisle immediately north of the Nordyke and
Allis rolls, his head under the lower pulley of the Nordyke
roll and one of his arms under the lower pulley of the Al-
lis roll. His right arm was fractured between the elbow
and shoulder and the muscles of that arm were torn and
wrenched. One of his ears was nearly torn away, the side
of his face was bruised and the base of the skull was frac-
tured. Death resulted from these injuries on August 29,
1911. One of the witnesses found a stick of the belt dress-
ing about six inches long and mashed flat lying on the south
side of the Allis roll. One of the rolls was not running
when the body of Hahn was found and the board partition

between the two rolls was torn down. The rolls and other machinery in the mill were driven by steam power. The evidence shows clearly that the deceased was killed by being in some manner caught by the belt and pulleys while doping the belt.

There was no guard of any kind in front of or surrounding the pulleys and belts of the Nordyke and Allis rolls. One of the issues submitted to the jury was whether or not any guard would have been practicable. Two witnesses for the defendant in error testified that a practicable guard for the protection of one engaged in applying belt dope to the belts of the Nordyke and Allis rolls would be one or more iron bars extending from the west side of the boxing of the Nordyke roll to the east side of the boxing of the Allis roll, a few inches away from and in front of the belt; that one of the bars should be just under the upper pulley, about three feet above the floor, and that with the hand and arm resting on that bar that distance from the lower pulley it would not be possible for the hand to be drawn between the belt and the lower pulley; that when the belt dope is applied to the belt its tendency is to stick to the belt and cause the hand to be drawn down toward the lower pulley by the moving belt, and at that height from the lower pulley the tendency would be to jerk the stick of dope out of the hand when it stuck tight to the belt but would not carry the hand low enough to be caught in the lower pulley. A third witness suggested the putting up of a fence in front of the rolls, consisting of upright and cross-bars, and testified that such a guard would make it impossible for a person to be drawn into the pulley and would not prevent the operation of the machinery. An expert witness for plaintiff in error testified that it would be practicable to protect persons passing by the rolls in question by a solid guard or screen between the belts and pulleys, screening them off from the aisle so that a person could not accidentally slip or intentionally push any por-

tion of his body or clothing into the moving belts, and that that is the only practicable guard known to him; that with such a guard the belt could not be doped without the removal of the guard; that in order to make a bar-guard effective it would have to be placed so far away from the moving machinery as to make it impossible to reach the moving parts with the hand and therefore no dope could be applied with such a guard; that a bar-guard in front of the belts and extending from the outside of one roll to the other would render the machinery more dangerous to a person applying dressing to the belt than if nothing were there, because the hand, with the bar, would have less freedom of movement; that a guard consisting of uprights and cross-bars five or six inches apart and two or three inches away from the moving belts would not be effective, because it would permit the hand, foot or clothing to be thrust accidentally or intentionally between the bars and the body to be drawn into the machinery.

This cause was three times tried in the circuit court. A verdict was rendered for defendant in error by the jury in the first and third trials. The cause was taken from the jury on the second trial on motion of plaintiff in error, but the judgment of the circuit court in favor of the plaintiff in error was reversed by the Appellate Court and the cause remanded. The court refused to instruct the jury to return a verdict for plaintiff in error on the third trial.

Two grounds are urged by plaintiff in error for the reversal of the judgment for the refusal of the court to instruct the jury to find for plaintiff in error: (1) That the doping of the belt constituted the making of repairs within the contemplation of the statute; and (2) that Hahn occupied the position of superintendent of the mill, and that it was his duty to see that the statute was complied with requiring such machinery to be guarded when practicable. The evidence offered on the part of the defendant in error tended to show that Herman Becker, and not Hahn, was

superintendent and manager of the mill, and that Hahn had
no authority to incur any expense at all except when di-
rected to do so by Becker, and that Becker was the one
who employed and discharged the men there engaged.
Hahn could not be held accountable for the failure to guard
the machinery unless it were a part of his duty to see that
it was properly guarded. There was no evidence in the
record that it was Hahn's duty to guard the machinery.
Proof that he was superintendent of the mill, considered
alone, would not establish the duty upon Hahn to guard
the rolls.

The statute in question was designed to protect and
safeguard employees working with and about dangerous
machinery so far as it is possible to do so. In addition
to the provisions of the first section of the act, the sub-
stance of which is already set out, the second section pro-
vides that no safeguard required by the act shall be re-
moved or made ineffective during the active use or operation
of the machine or device so guarded except for the pur-
pose of immediately making repairs thereto, and that all
such safeguards so removed shall be promptly replaced.
The third section requires effective means to be provided
for immediately disconnecting the power, so that in case
of need or accident any particular machine, group of ma-
chines, room or department can be promptly and effectively
shut down. It also provides that where machines are re-
quired to be started and stopped frequently, they shall,
wherever practicable, be provided with tight and loose pul-
leys or other effective disengaging device, and that where
provided with tight and loose pulleys the shifting of the
belt shall be accomplished by use of a belt-shifter placed
within easy reach of the operator. It also provides for
power-controlling devices. The other sections of the act
make minute provisions for the protection of the employees
in almost every contingency. Paragraph 1 of section 31
reads thus: "All machinery when in operation is danger-

ous, and should be considered so by the operator. It should be so protected as to offer the least possible chance for injury to those who operate it." It is the evident purpose of the act to prevent an employee coming in contact with any moving machinery except where the same is necessary in the actual operation of the same.

Plaintiff in error contends that oiling machinery for the purpose of making the parts slippery so as to cause it to run smoothly, and doping a belt to make it adhere to a pulley and cause it to pull or run the pulley without slipping, are both, within the meaning of the statute, "making repairs;" that when machinery is not so placed as to be safe the statute requires it to be enclosed, fenced or otherwise properly protected when practicable, and that the pulleys and belts in question could not be properly guarded without completely enclosing them with a fence or network high enough and with openings so small that no one could accidentally fall and thrust an arm or other part of his body or his clothing into the pulleys and belts or intentionally do so and be injured. It is then further argued that there is no liability in this case because the belts could not be doped without removing such a guard; that the statute prohibits, under penalty of a fine, any employee from removing a guard except for making repairs, and if doping be not repairing, an employee who removes such an enclosure to dope a belt while in motion violates the statute and cannot recover for an injury received by reason of such violation; that if doping is making repairs, the statute positively forbids the making of repairs while the machinery is in motion, and therefore an employee doping a belt could not recover for an injury thereby because of his willful violation of the statute. It is therefore suggested that the only reasonable solution of the statute, to avoid inconsistent conclusions, is to hold that doping a belt is the making of repairs within the meaning of the statute, and that to comply with the requirements of the statute it is necessary that

the machinery be stopped in every instance while doping the belt.

It is certainly true that if the belts and pulleys cannot be guarded in any manner except by a tight wire mesh or other such guard extending from the floor to the top of the boxing around the rolls, or higher, so that it is not possible for the belts and pulleys to be reached or touched by any person, intentionally or otherwise, that method is the only practicable method of guarding the machines and there would be no liability against plaintiff in error in this suit. That would be so because such a guard would have to be removed to dope the belts, whether the machinery was in motion or stopped. The evidence for defendant in error is, in substance, that by means of cross-bars, or uprights and cross-bars, the belts and pulleys in question could have been so guarded that injury to one doping a belt while in motion would be hardly possible. It was a question for the jury to decide whether or not such a guard would so protect one while doping the belts. If it would, then it was practicable to so guard the pulleys and belts as to prevent just such an injury as Hahn received. The evidence also shows that the greatest danger the pulleys and belts offered was to the person or persons whose business it was to dope the belts and not to persons casually passing by or watching the machinery. It is very apparent, also, that the bars and cross-bars might be placed close enough above and below the point of doping the belts to guard against injury to persons who might accidentally stumble or fall while in front of the belts and pulleys. There can be no question that under the evidence for the defendant in error bars and cross-bars could be so placed in front of the belts and pulleys as to greatly minimize, if not to entirely remove, all danger of injuries to persons by reason of the moving belts and pulleys. The statute clearly requires that such a guard be made by plaintiff in error although it might not do away with all possibility of danger, and without such a guard the

jury were warranted in finding, under the evidence, that Hahn was injured by reason of the plaintiff in error's violation of the statute. *Strecter* v. *Western Scraper Co.* 254 Ill. 244; *Forrest* v. *Roper Furniture Co.* 267 id. 331; *Supolski* v. *Ferguson & Lange Foundry Co.* 272 id. 82.

We cannot assent to plaintiff in error's proposition that oiling machinery to make it run smoothly, or doping a belt to increase the friction to prevent the slipping of the belt, are both "repairing" within the meaning of the statute. If that were true, the newest, soundest and most perfectly constructed machinery might be considered as out of repair. It is a well known fact that all new, or most all new, machinery requires oiling before use to prevent unnecessary friction and heating of surfaces of the moving machinery. On the other hand, certain moving machinery, such as belts and pulleys, require friction, and after using for a time friction may be the only quality lacking. The evidence shows in this case that the only quality lacking in the belts was more friction in order to give them the necessary pulling power,—at least the evidence does not disclose any other defect in the belt in question. The evidence shows, also, that it is customary to dope belts in other mills, and that was Hahn's duty in plaintiff in error's mill. The statute therefore required the guarding of the belts and pulleys in question in order to protect Hahn while doping the belts. The statute·makes no distinction in its requirements of guarding machinery or dangerous places, whether they operate purely automatically and without any workmen coming in contact with them, or whether they are merely dangerous places or dangerous substances around or about which men may work and be in danger by reason of the presence of such places or substances, such as vats or pans and receptacles containing molten metal, hot or corrosive fluids, and dangerous places in and about mercantile establishments, factories, mills, etc. According to lexicographers the definition of the word "repair" is to restore to a good,

sound state after decay, injury, dilapidation or partial destruction. Machinery "out of repair" signifies, according to that definition, decayed, injured, dilapidated or partially destroyed machinery,—and that is the commonly understood meaning of those words. There is no evidence tending to show that such words have any different or other meaning in flour mills, factories, etc., and the statute does not specially define those words. In construing statutes the ordinary, usual and commonly accepted definitions of the words employed therein are to be taken as the correct definitions of such words, unless the statute gives special definitions to the contrary or evidence is introduced to show that the words have a particular meaning in the particular trade or calling referred to in the statute. It seems to us that it would be a strange and unusual construction to hold that "doping a belt," under the evidence in this case, is making repairs within the meaning of the statute.

Complaint was also made by plaintiff in error of the court's refusal to give certain instructions offered by it and in the giving of the first instruction for the defendant in error. We have carefully examined all the instructions in question and find that the court did not err in its rulings thereon. As the decision of the other questions already passed on is a complete answer to the plaintiff in error's objections to the rulings of the court on the instructions given and refused it will not be necessary to further comment thereon.

Finding no reversible error in the record the judgments of the Appellate and circuit courts are affirmed.

*Judgment affirmed.*

Mr. JUSTICE COOKE, dissenting.